UNITED STATES OF AMERICA      :

     :

     :     ss: New Haven, Connecticut

     :

COUNTY OF NEW HAVEN        :

FILED

2018 JUN -7  P 3: 19

U.S. DISTRICT COURT
NEW HAVEN, CT.

## AFFIDAVIT

I, Jonah Mazzacane, being duly sworn, depose and state as follows:

## I.     TRAINING AND BACKGROUND

1.     I am employed as a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately nine years.

2.     I am currently assigned to DEA's New Haven District Office ("NHDO"). During my assignment to the DEA NHDO, and previous assignment to the DEA New York Drug Enforcement Task Force, I have prepared numerous affidavits in support of applications for federal search warrants and arrest warrants, as well as in support of authorizations to conduct electronic surveillance. As a case agent, I have directed and coordinated electronic surveillance, controlled purchases of drugs, physical surveillance, and undercover activities as well as debriefed and managed confidential sources. I am familiar with the manner in which individuals obtain, finance, store, manufacture, transport, and distribute their illegal drugs. I have a Bachelor of Science degree from Roger Williams University. I have completed the sixteen-week DEA Basic Agent Trainee academy in Quantico, Virginia. Prior to my career with the DEA I was a Police Officer in Torrington, Connecticut for approximately 4 years. I have also attended numerous law enforcement training courses related to the field of drug law enforcement.

3.     I am also an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States

Code, Section 2516.  This affidavit relates to an investigation, in which I have been involved, into LAPRESE GOLLMAN and LATOYA MCKREITH and others identified and, as of yet, unidentified, believed to be involved in a Drug Trafficking Organization ("DTO") with ties to Massachusetts, Connecticut and abroad.

4.      As particularly relevant to this affidavit, I have been investigating LAPRESE GOLLMAN and others for potential violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute 500 Grams or More of a Mixture and Substance Containing Cocaine).

5.      I make this affidavit in support of an application for a search and seizure warrant for the contents and records of the subject devices identified as follows below and in Attachment A:

        a.  One (1) Samsung cellular telephone, Model Galaxy S8+ and International Mobile Equipment Identity ("IMEI") 357757082787049 ("**Subject Device 1**");

        b.  One (1) Samsung Watch, Model Gear S3 Frontier Cellular Watch SM-R765A(6547A) and IMEI 352518082164364 ("**Subject Device 2**");

        c.  One (1) LG cellular telephone, Model LM-X210MA and IMEI 356233090254852 ("**Subject Device 3**"); and

        d.  One (1) Motorola cellular telephone, Model Moto XT1765 and IMEI 35567408517682 ("**Subject Device 4**");

6.      All of these devices, collectively referred to herein as the "**Subject Devices**," are currently in DEA custody, and were seized from GOLLMAN incident to his arrest on May 30, 2018. Based on the information gained throughout the course of this investigation, as well as my

training and experience, it is my belief that these devices were utilized by LAPRESE GOLLMAN in furtherance of his involvement in the conspiracy to possess with intent to distribute 500 grams or more of a mixture and substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii) and 846.

7.      This affidavit does not set forth all of the facts and evidence that I have gathered during the course of the investigation of this matter.  Rather, this affidavit is intended to show merely that there is sufficient probable cause for the search warrant, and does not set forth all of my knowledge about this matter.  In particular, there is more evidence relating to the Confidential Source ("CS") identified below, including communications and audio and video recordings, that has been left out to protect the identity of the CS.  The statements contained in this affidavit are based, in part, on information provided by Special Agents and Task Force Officers of the DEA, as well as other officers from state and local agencies, including but not limited to the New Haven Department ("NHPD"), on law enforcement officers' review of seized electronic evidence and on the experience and training of the Affiant.

## PROBABLE CAUSE

8.      In mid-April, 2018, the DEA's NHDO and the NHPD's Narcotics Enforcement Unit gathered intelligence that an individual known as "L.A." aka "Triny Boy," later identified as Laurence Alexander, was coordinating with an unknown female, later identified as LATOYA MCKREITH, in order to traffic multi-kilogram quantities of cocaine in Connecticut and the surrounding areas on behalf of a larger DTO.  MCKREITH was acting as a broker for an unknown male, later identified as LAPRESE GOLLMAN.  GOLLMAN, MCKREITH and Alexander had been looking for a Source of Supply ("SOS") who could provide consistent, multi-kilogram shipments.

9.      GOLLMAN, who was previously convicted of conspiracy with intent to distribute narcotics, was listed as serving Federal Probation in New Haven.  Officers determined that GOLLMAN had been charged after a multi-defendant wiretap (Title III) investigation into narcotics trafficking conducted by the DEA's Springfield office.

10.     Based on surveillance conducted by the NHDO, officers determined that MCKREITH operated a Honda Accord registered to her, with an address that is known to me, on Ramblewood Drive, in Springfield, Massachusetts.  Additionally, the NHDO identified that MCKREITH was utilizing cellular telephone, 413-693-4688, to coordinate the above referenced trafficking.  An administrative subpoena revealed that this phone was subscribed by MCKREITH and that it listed the same Ramblewood Drive home address as MCKREITH's car registration.  Toll records showed that MCKREITH's telephone was in regular contact with the phone number GOLLMAN submitted to his Federal Probation Officer of 860-402-8822.

11.     Commercial and law enforcement database searches revealed GOLLMAN to have a listed residence known to me on Arrowbrook Road in Windsor, Connecticut.

12.     Additionally, the NHDO learned that MCKREITH and then MCKREITH and GOLLMAN had met with a third party (whose identity is known to me) in New Haven, Connecticut, on May 1 and May 15 of 2018, in order to negotiate a multi-kilogram cocaine transaction.  Both times, the meeting was observed by NHDO surveillance officers.

13.     On May 15, 2018, GOLLMAN and MCKREITH were observed by law enforcement officers to meet with the third party on Long Wharf Drive, New Haven, Connecticut.  Following the meeting, GOLLMAN and MCKREITH left New Haven in a rented vehicle.  Members of the NHDO observed the vehicle travel to Wendy's Restaurant on Ella Grasso Blvd, Windsor, Connecticut with both passengers inside.  The vehicle then left the lot operated by

4

GOLLMAN and traveled to Springfield, Massachusetts.   Subsequently, an administrative subpoena was served on the rental company (Avis).  The subpoena revealed that GOLLMAN had rented the vehicle utilizing his Connecticut issued Driver's License, which listed his address on Arrowbrook Rd, Windsor, Connecticut.  During the second meeting, GOLLMAN had indicated that he had a supply of narcotics at that time, but that he would need to resupply soon.

14.     On May 30, 2018, the NHDO learned through information from a CS, who has proven to be credible and reliable, that GOLLMAN and MCKREITH had finalized negotiations with the third party mentioned above to purchase four kilograms of cocaine at a price of $25,000 per kilo.  During negotiations, GOLLMAN and MCKREITH had made clear that they were looking for a SOS to provide a consistent supply of kilograms of cocaine.  In addition, GOLLMAN and MCKREITH anticipated receiving an additional kilogram of cocaine on consignment.

15.     On May 30, 2018, the DEA's NHDO formulated plans to conduct surveillance of GOLLMAN and MCKREITH and to execute an arrest upon observation of a narcotics transaction. Information from the CS further established that GOLLMAN and MCKREITH had communicated regarding the cocaine they were intending to purchase, including by acknowledging a picture of the product, and had indicated that they were ready to bring the money with them for the purchase. At approximately 6:15 p.m., members of NHDO observed MCKREITH operating a Dodge sport utility vehicle on Long Wharf Drive with GOLLMAN in the front passenger seat.   MCKREITH parked the Dodge vehicle adjacent to the vehicle of the same third party listed above.

16.     Once it had been confirmed that GOLLMAN and MCKREITH were preparing to enter into a narcotics transaction, members of the NHDO approached all three parties, secured GOLLMAN and MCKREITH's vehicle, and inside the vehicle, found a leather bag containing a large amount of United States Currency.  That bag was found in the front passenger area of the car

in between GOLLMAN's knees.  MCKREITH was driving the vehicle.  An official count of the currency showed that $100,000 was in the bag.  GOLLMAN had $665 found in his pocket.  $100,000 is the amount of money GOLLMAN and MCKREITH needed to purchase the four kilograms of cocaine.

17.     The three cellular phones (Subject Devices 1, 3 and 4) were located within the cockpit area of the vehicle.  GOLLMAN was wearing the Samsung watch (Subject Device 2).  In the vehicle, law enforcement officers also found titles to various vehicles, multiple sets of keys and various receipts including a receipt of a money transfer for someone in federal custody.  MCKREITH identified two additional telephones, which belonged to her.  GOLLMAN and MCKREITH were *Mirandized* on scene and transported to the Hamden Police Department for processing.

18.     At the Hamden Police Department, GOLLMAN was again advised of his rights via a DEA Advice of Rights Form.  GOLLMAN did not provide a post-arrest statement.

19.     At the Hamden Police Department, MCKREITH was again advised of her rights via a DEA Advice of Rights Form.  MCKREITH agreed to give a post-arrest statement.  MCKREITH acknowledged that she had traveled to New Haven in order to conduct a cocaine transaction with GOLLMAN.  MCKREITH has known GOLLMAN for more than 10 years and in the last 18 months has had an intimate relationship with him.  MCKREITH stated that she was put in touch with the third party SOS by Laurence Alexander ("L.A."), with whom she had an intimate relationship in the past.  Alexander connected MCKREITH with the third party for the purpose of conducting multi-kilogram cocaine transactions so she could earn money to get her fashion design company off the ground.  MCKREITH gave written consent to have investigators search her cellular telephones (two).

6

20.     In her post-arrest interview, MCKREITH further stated that GOLLMAN was listed as "p" in the contacts section of her cellular phone.  An initial check of her phone revealed that there are two phone numbers listed for "p"—one of which is the number that GOLLMAN had provided to Federal Probation (860-402-8822) and a second telephone number of 475-201-4132. The fact that GOLLMAN has two phone numbers listed indicates that he uses more than one telephone.  There is extensive contact in MCKREITH's phone log between GOLLMAN and MCKREITH.  Law enforcement officers also believe that the two were using an application, like WhatsApp, or some other means to communicate as there does not appear to be much contact between the two in the call logs of MCKREITH's phone on May 30, 2018 when they were arrested.

21.     Law enforcement officers have not had the opportunity to fully extract the information from MCKREITH's cellular phones.  However, from a preliminary review of messages, law enforcement officers found evidence of MCKREITH's and GOLLMAN's regular communications as well as MCKREITH's communications by telephone and WhatsApp with Alexander who is believed to be another member of the DTO.

22.     GOLLMAN's Samsung watch also functions as a cellular telephone and I have learned that he was utilizing the watch after his arrest.  Thus, I have reason to believe and do believe that he may have been attempting to communicate with co-conspirators following his arrest.

23.     Additionally, I have spoken with case agents who worked on the prior investigation into GOLLMAN in Massachusetts and have learned that during that investigation GOLLMAN utilized a cellular telephone to communicate with co-conspirators to arrange multi kilogram quantities of cocaine.  It is my belief and the belief of other case agents involved in this investigation that GOLLMAN was again using cellular telephones to conduct his narcotics

trafficking activities and that the Subject Devices will likely contain evidence of his narcotics trafficking.

24.     GOLLMAN and MCKREITH were arrested on May 30, 2018 and charged pursuant to a federal complaint on May 31, 2018.

25.     Based on GOLLMAN's prior history, his communications with MCKREITH in this case and my training and experience, I have reason to believe and do believe, that there is likely to be evidence of GOLLMAN's narcotics trafficking activities contained on the Subject Devices and thus, I am requesting permission to search those devices.  This Affiant further knows, from training and experience, that drug dealers regularly use more than one telephone at a time to communicate with narcotics customers.  I also have reason to believe that GOLLMAN was using one or more of the Subject Devices to arrange narcotics transactions with other members of the DTO, aside from just MCKREITH, as he indicated that he had a supply of narcotics from another source when he met with the third party on May 15, 2018.  Thus, I have reason to believe that the telephones will contain communications with other DTO members regarding narcotics transactions.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANTS

26.     Based on my training, experience, I know that the aforementioned Subject Devices may have some or all of the capabilities that allow it to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system ("GPS") navigation device, a hand-held radio, and a personal digital assistant ("PDA").  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

8

27.     I request permission to seize and search the Subject Devices for evidence relating the unlawful distribution, and the possession with intent to distribute, narcotics, including any evidence of communications between GOLLMAN and other potential co-conspirators involved in the distribution of narcotics as well as other criminal acts.  Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used to communicate efforts to conduct criminal activities and it is likely that the Subject Devices were used by GOLLMAN to communicate with potential co-conspirators in the unlawful distribution of narcotics.  Based on my training and experience and information obtained throughout the course of this investigation I know that narcotics dealers often maintain several phones to communicate with customers and thus these devices are also likely to contain evidence of GOLLMAN's narcotics trafficking activities.

28.     Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so.  Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics.  Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics and/or shipping packages within which the narcotics are concealed, and firearms, as firearms are generally considered tools of the trade in narcotics activity.  Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones and other wireless devices, including phones used by those involved in the distribution of narcotics:

a.   the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d.   any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.   any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.   saved searches, locations, and route history in the memory of said devices;

h.   internet browsing history, to include, internet searches in the memory of said device; and

i.   Images and videos in the memory of said device.

29.   It is also requested that the Court authorize the retrieval of the above described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant.  Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure.  Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

30.     It is also requested that the warrant be deemed executed once the Subject Devices have been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.     The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

32.     As described above and in Attachment B, this application seeks permission to search and seize things that the Subject Devices might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33.     Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine

11

whether it falls within the scope of the warrant.  In light of these difficulties, the DEA, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

34.    I submit that this affidavit supports probable cause for a search warrant to search the Subject Devices for the items described in Attachment B as evidence, fruits, and instrumentalities of the crime of conspiracy to possess with intent to distribute and distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii) and 21 U.S.C. § 846.

Jonah Mazzacane
DEA Special Agent

Subscribed and sworn to before me this _7th_ day of
~~May~~, 2018
June

/s/ Robert M. Spector
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A

a.  One (1) Samsung cellular telephone, Model Galaxy S8+ and International Mobile Equipment Identity ("IMEI") 357757082787049 ("**Subject Device 1**");

b.  One (1) Samsung Watch, Model Gear S3 Frontier Cellular Watch SM-R765A(6547A) and IMEI 352518082164364 ("**Subject Device 2**");

c.  One (1) LG cellular telephone, Model LM-X210MA and IMEI 356233090254852 ("**Subject Device 3**"); and

d.  One (1) Motorola cellular telephone, Model Moto XT1765 and IMEI 35567408517682 ("**Subject Device 4**");

## ATTACHMENT B

All records contained in the Subject Devices for evidence of violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 846 to include the following:

1. the telephone number, ESN number, serial number, and SIM card number of the Subject Devices;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the Subject Devices;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes (violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 846);

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the Subject Devices;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the Subject Devices, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said Subject Devices;

8. internet browsing history, to include, internet searches in the memory of the Subject Devices;

9. images and videos in the memory of the Subject Devices; and,

10. evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described Subject Devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described Subject Devices may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.